UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

SEP 28 1999

ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

```
*************************
                          *
U.S. EQUAL EMPLOYMENT     *   CIVIL ACTION NO. 98-1637
OPPORTUNITY COMMISSION    *
        Plaintiff         *
                          *
and                       *   JUDGE WALTER ("S")
                          *
LINDA LOGAN               *
        Intervenor        *
                          *
VERSUS                    *
                          *
                          *   MAGISTRATE JUDGE PAYNE
                          *
GENERAL MOTORS CORPORATION*
        Defendant         *
                          *
                          *
*************************
```

### DEFENDANT GENERAL MOTORS CORPORATION's
### STATEMENT OF UNCONTESTED MATERIAL FACTS
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to LR56.1, Defendant, General Motors Corporation (hereinafter "General Motors"), submits the following Statement of Uncontested Material Facts in Support of its Motion for Summary Judgment:

1. The Shreveport plant is a unionized, truck assembly plant. (See Aff. F. Schild at p. 1).

2. Because the hourly employees at the Shreveport plant are unionized, the Shreveport Personnel Department is divided into an hourly and salaried side, with both sides



1

reporting to the top personnel position for the Shreveport plant, the Personnel Director, Dave Harmon. (See Aff. F. Schild at p. 1).

3.  The General Supervisor-Salaried Personnel Administrator, Fred Schild, is in charge of the salaried side. (See Aff. F. Schild at p. 2).

4.  Because of the numerous different issues affecting represented employees versus non-represented employees, each side handles the personnel matters related to employees within their respective scope. This distinction is well understood by the employees at the Shreveport plant. (See Aff. F. Schild at p. 1-2).

5.  General Motors has numerous policies and procedures in place to prevent and correct any sexual harassment and has conducted training at the Shreveport plant, including training of Ms. Logan and the alleged harasser, James Reed, to prevent sexual harassment:

- Ms. Logan received sexual harassment training on March 11, 1992 and June 20, 1995. Mr. Reed also received the same sexual harassment training on June 29, 1995; and

- In Ms. Logan's and Mr. Reed's training it was emphasized, e.g., (i) that sexual harassment includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature; (ii) that General Motors does not tolerate sexual harassment in the workplace; and (iii) that if confronting the harasser does not stop the behavior, then the harassment should be reported through the appropriate channels.

(See Aff. F. Schild at pp. 2-3 and attached Aff. Exh. A-C).

6.  At the Shreveport plant, General Motors provides three avenues for a salaried supervisor to complain of harassment: (i) anonymously through General Motors' "Awareline"; (ii) an "Open Door" or sexual harassment complaint to the alleged harasser's supervisors or to the General Supervisor-Salaried Personnel Administrator, Fred Schild; or (iii) a sexual harassment complaint to the Shreveport plant's EEO Coordinator, Jeff McGuire or Lauri

2

Wallace. (See Aff. F. Schild at p. 3 and attached Aff. Exh. D).

7.  Ms. Logan admits she was aware of these complaint procedures, but that she nonetheless never used them during the two years she claims she was harassed. (See L. Logan Depo. Vol. I., pp. 61-65) (attached here as Exhibit 3).

8.  The Shreveport plant has always promptly investigated and remedied any complaints involving alleged supervisor sexual harassment. (See F. Schild Aff., p. 4).

9  From 1991 until Ms. Logan left work in August 1996 there were two complaints involving inappropriate behavior by supervisors. (See F. Schild Aff., p. 4).

10.  The first involved a complaint that on January 15, 1991 a supervisor, G. Presley, pinched an employee, D.L. Arnett, on her rear. (See F. Schild Aff., p. 4 at attached Aff. Exh. E).

11.  The employee complained to a superintendent, who met with the supervisor that day and informed him (i) his conduct was inappropriate and (ii) he was not to touch the employee in any "shape, form, or fashion." (See F. Schild Aff., p. 4 at attached Aff. Exh. E).

12.  Over the next week, the salaried Personnel Administrator, Fred Schild, followed up with an investigation of the complaint, confirmed the inappropriate behavior had occurred, and met with the Shreveport plant Human Resource Management Committee ("HRM Committee") to determine appropriate discipline. (See F. Schild Aff., pp. 4-5 at attached Aff. Exh. E).

13.  Based on that meeting, on January 24, 1991, Mr. Presley was informed because of his poor judgment and inappropriate action he was (i) suspended without pay for 10 days, and (ii) demoted to a non-supervisory position with a 15% cut in pay. (See F. Schild Aff., p. 5 at attached Aff. Exh. E).

14. The second complaint involved a claim that on May 5, 1992 a supervisor, T. Corr, made an inappropriate comment while breaking up an employee dispute. (See F. Schild Aff., p. 5 at attached Aff. Exh. F).

15. Specifically, the complaining employee was involved in verbal altercations that day with both male and female employees and, in apparent frustration, the supervisor said "My god, is everyone on the rag tonight." (See F. Schild Aff., p. 5 at attached Aff. Exh. F).

16. Although only one employee complained about this off-hand remark, nonetheless, within the week the complaint was investigated and the Assistant Plant Manager met with the supervisor to (i) verbally counsel him, (ii) review the corporate policy on inappropriate behavior with him, and (iii) inform him he must refrain from any behavior that had even the appearance of being derogatory or offensive. (See F. Schild Aff., p. 5 at attached Aff. Exh. F).

17. Despite never making a complaint of harassment, Ms. Logan claims for her last two years at work she was continuously subjected to sexual harassment by her supervisor, James Reed. (See L. Logan Depo. Vol. I, pp. 8-9) (attached here as Exhibit 4).

18. Ms. Logan claims Mr. Reed used vulgar and obscene language and would make sexually suggestive comments and jokes. (See L. Logan Depo. Vol. I., pp. 8-13 (attached here as Exhibit 5), and Depo. Exh. 2 at bates numbers A 00196 to A 00197 (attached here as Exhibit 6).

19. In addition, Ms. Logan claims Mr. Reed would come up behind her and rub against her, simulating sex through "humping" motions. (See L. Logan Depo. Vol. I., pp. 8-13 (attached here as Exhibit 5), and Depo. Exh. 2 at bates numbers A 00196 to A 00197 (attached here as Exhibit 6).

20. Finally, Ms. Logan claims on May 15, 1996 Mr. Reed exposed himself to her. (See L. Logan Depo. Vol. I., pp. 8-13 (attached here as Exhibit 5), and Depo. Exh. 2 at bates numbers

4

A 00196 to A 00197 (attached here as Exhibit 6).

21. Ms. Logan left work on sick leave on August 22, 1996. . (See L. Logan Depo. Vol. I., pp. 8-13 (attached here as Exhibit 5), and Depo. Exh. 2 at bates numbers A 00196 to A 00197 (attached here as Exhibit 6).

22. Ms. Logan's own audiotapes disclose, however, that Ms. Logan was giving at best "mixed signals" regarding the "unwelcomenss" of the conduct of which she now complains. (See L. Logan Depo. Vol. I., p. p. 76-77) (attached here as Exhibit 7).

23. *After* the alleged May 15, 1996 exposure incident, Ms. Logan began secretly taping Mr. Reed and other employees. (See L. Logan Depo. Vol. I., p. p. 76-77) (attached here as Exhibit 7).

24. In her own tapes, Ms. Logan was laughing and "cutting up" with a another employee regarding: (i) Mr. Reed "humping" and exposing himself to Ms. Logan, (ii) Mr. Reed's "wanna fuck" type comments, and (iii) Mr. Reed's sex life with his wife and whether he had "crabs." (See L. Logan Depo. Vol. I., pp. 83-87 (attached here as Exhibit 8); See L. Logan Depo. Vol. I., pp. 82-83 (attached here as Exhibit 9); See L. Logan Depo. Vol. I., pp. 88-89 (attached here as Exhibit 10).

25. Perhaps even more "mixed" are Ms. Logan's tapes showing her engaging in sexual banter with Mr. Reed himself on, e.g., who was sleeping with who at the plant, and locker-room talk about what another women's breasts looked like. (See L. Logan Depo., Vol. I, pp. 90-98 (attached here as Exhibit 11); L. Logan Depo. Vol. I., pp. 101-102 (attached here as Exhibit 12).

26. When it came to workplace grievances *not* involving sexual harassment, Ms. Logan aggressively used the "Open Door" complaint procedures provided by General Motors.

5

(See Aff. F. Schild p. 7;  Aff. G. Smith 2).

27.  Ms. Logan made three "Open Door" complaints from 1993 to 1994. (See Aff. F. Schild p. 7-8;  Aff. G. Smith 2-3).

28.  Ms. Logan's first complaint was to the Assistant Plant Manager, Gary Smith, and involved her claim Mr. Smith's subordinate, the former Area Manager Paint, Chuck Danforth, used abusive language. (See Aff. G. Smith at p. 2;  L. Logan Depo. Vol. I., pp. 20-21) (attached here as Exhibit 13).

29.  Mr. Smith discussed this complaint with Ms. Logan, who agreed to hold a meeting with her, Mr. Danforth, and Ms. Smith.  (See Aff. G. Smith at p. 2;  L. Logan Depo. Vol. I., pp. 20-21) (attached here as Exhibit 13).

30.  In this meeting Mr. Smith reiterated to Ms. Danforth that General Motors does not tolerate abusive treatment towards its employees. (See Aff. G. Smith at p. 2;  L. Logan Depo. Vol. I., pp. 20-21) (attached here as Exhibit 13).

31.  This was a cordial meeting in which Mr. Danforth apologized to Ms. Logan and in which, as Ms. Logan herself admits, all parties left satisfied with the resolution of the complaint. (See Aff. G. Smith at p. 2;  L. Logan Depo. Vol. I., pp. 20-21) (attached here as Exhibit 13).

32.  In her second "Open Door" complaint, Ms. Logan asserts she *meant* to complain to the salaried Personnel Administrator Fred Schild about alleged non-sexual, abusive conduct by Mr. Reed. (See L. Logan Depo. Vol. I., pp. 29-31) (attached here as Exhibit 14).

33.  Ms. Logan admits, however, that the best she can remember from the meeting on this issue she never complained to Mr. Schild about Mr. Reed because Mr. Reed took over the

meeting (i) to tell Mr. Schild what a good job Ms. Logan had been doing and (ii) to recommend Ms. Logan be sent to a class to help her develop her interpersonal skills. (See L. Logan Depo. Vol. I., pp. 29-31) (attached here as Exhibit 14).

34. Although Ms. Logan apparently took a dim view of this class, referring to it as "charm school," this class was part of the developmental training provided salaried employees and, like all developmental training for employees, was viewed as a positive part of Ms. Logan's career development. (See F. Schild Aff. p. 8).

35. This class was not considered punishment and Ms. Logan was not sent to this class because she had a desire – an unexpressed one – to make an "Open Door" complaint about Mr. Reed. (See F. Schild Aff. p. 8).

36. After this class, Ms. Logan herself received some of her largest raises, including the special pay adjustment she received from her third "Open Door" complaint. (See F. Schild Aff. p. 8).

37. Ms. Logan' third and final "Open Door" complaint involved Ms. Logan's assertion around June 1994 she was not being paid enough, particularly in comparison to other first-line supervisors. (See Aff. F. Schild pp. 8-9 and attached Aff. Exh. K; Aff. G. Smith pp. 2-3; L. Logan Depo. Vol. I, pp. 21-23) (attached here as Exhibit 15).

38. Pay raises are handled through the annual ratings of employees based on their performance. (See Aff. F. Schild pp. 8-9 and attached Aff. Exh. K; Aff. G. Smith pp. 2-3; L. Logan Depo. Vol. I, pp. 21-23) (attached here as Exhibit 15).

39. Nonetheless, Mr. Schild thoroughly investigated Ms. Logan's complaint, determined Ms. Logan's compensation had fallen behind others doing similar work, and made a

request for a special adjustment of $175 a month ($2100 annual) to Ms. Logan's base pay. (See Aff. F. Schild pp. 8-9 and attached Aff. Exh. K; Aff. G. Smith pp. 2-3).

40. Gary Smith and Mr. Schild then met with Ms. Logan and informed her they were seeking this adjustment, along with the admonition this was a special adjustment because pay increases must be earned through the performance review process based on her work performance, not through special appeals. (See Aff. F. Schild p. 9 and attached Aff. Exh. K; Aff. G. Smith pp. 2-3).

41. Because of this, they informed Ms. Logan she should not make another "Open Door" complaint regarding adjusting her pay. (See Aff. F. Schild p. 9 and attached Aff. Exh. K; Aff. G. Smith pp. 2-3; L. Logan Depo. Vol. I, pp. 21-23) (attached here as Exhibit 15).

42. Ms. Logan was so pleased with the resolution of her complaint that she sent Gary Smith a "thank you" card in which she told Mr. Smith "I trusted you to handle my problems" and thanked him profusely for handling her complaint. (See Aff. F. Schild p. 9 and attached Aff. Exh. K; Aff. G. Smith p. 3; L. Logan Depo. Vol. I, pp. 21-23) (attached as Exhibit 15).

43. Ms. Logan now proffers two rationales for why she did not complain. (See L. Logan depo. Vol. I., pp. 30-31) (attached here as Exhibit 16).

44. First, Ms. Logan claims she feared retaliation had she complained. (See L. Logan deo. Vol. I., pp. 30-31) (attached here as Exhibit 16).

45. When questioned why, Ms. Logan claims she feared retaliation based on how her earlier generalized workplace grievances were handled – despite that fact she had received apologies and a pay raise for those very grievances. (See L. Logan deo. Vol. I., pp. 30-31) (attached here as Exhibit 16).

46. For example, she viewed being sent to class as "unfair" when she wanted to make – but in fact did not make – a complaint about Mr. Reed. (See L. Logan deo. Vol. I., pp. 30-31) (attached here as Exhibit 16).

47. And Ms. Logan viewed as a "threat" Mr. Smith's comments during her pay-raise meeting that Ms. Logan needed to improve her performance in order to justify pay raises and to retain her job. (See L. Logan Depo. Vol. I., pp. 32-36 & 72) (attached here as Exhibit 17).

48. However, when questioned further on the basis for why she would fear retaliation for a *sexual harassment* complaint, Ms. Logan admitted she knew of no one at the Shreveport plant who was fired, demoted, retaliated against, or otherwise harassed for making a complaint of harassment:

> Q. Did you ever know of anyone at GM to get fired for making a complaint of harassment sexual harassment?
>
> A. No. Well, I didn't know if anyone – no, I don't know of anyone getting fired.
>
> Q. For making a complaint of sexual harassment?
>
> A. No.
>
> Q. Do you know of anyone who was retaliated, demoted, etc.. harassed for making a complaint of sexual harassment at GM?
>
> A. No.

(L. Logan Depo., Vol. I., pp. 43-44) (attached here as Exhibit 1).

49. When questioned why she did not make an anonymous Awareline complaint, Ms. Logan offered she did not believe she would have benefited from such a complaint or that it would have been effective. (See. L. Logan Depo. Vol. I., pp. 65-66) (attached here as Exhibit 18).

9

50. Further, Ms. Logan concedes there is apparently nothing General Motors could have done in regards to her complaint that would have satisfied her. (L. Logan Depo. Vol. I., p. 142) (attached here as Exhibit 19).

51. When questioned about the subsequent investigation and termination of Mr. Reed, Ms. Logan asserted it would not have changed her opinion "at all" about complaining earlier:

> Q. The fact, though, that Mr. Reed – that your complaint was investigated, Mr. Reed was terminated, it doesn't change your opinion at all that you should have complained earlier about Mr. Reed's conduct?
>
> A. No. Because I know that I wouldn't – I tried and tried, and management pretty much stick together and make everything gel together. They always turned things around on me. And maybe I didn't have sense enough to communicate the way I should, you know. But anyway, I never got any help. And I needed my job. As you can see from bankruptcies and mamas and stepdaddys, I needed my job.

(L. Logan Depo. Vol. I., p. 142) (attached here as Exhibit 19).

52. Second, Ms. Logan now proffers she did not complain because she believed Mr. Reed's harassment of her was "common knowledge" throughout the Shreveport plant, thus upper management "must have known" of this harassment. (L. Logan Depo. Vol. I., p. 39) (attached here as Exhibit 20).

53. Ms. Logan's own tapes show she was giving "mixed signals" on whether Mr. Reed's alleged conduct towards her was unwelcome or offensive. (See L. Logan Depo. Vol. I., pp. 39-43) (attached here as Exhibit 21).

54. Ms. Logan nonetheless asserts Mr. Reed's harassment was "common knowledge" to upper management because she had mentioned Mr. Reed's conduct to other low-level supervisors and to her friend in labor relations, Gaylord Tice, and that Mr. Reed was harassing other female

employees. (See L. Logan Depo. Vol. I., pp. 39-43) (attached here as Exhibit 21).

55. Ms. Logan admits, however, she ignored Mr. Tice's advice to report the harassment and that she was adamant Mr. Tice should not get involved:

> Q. Did Gaylord Tice tell you that you should report the harassment?
>
> A. Yes.
>
> Q. Did Gaylord Tice ask to talk to Reed about the harassment?
>
> A. He just said, "You want me to talk to him for you?" I said, "Ooh, Lord no."

(L. Logan Depo. Vol. I., p. 44) (attached as Exhibit 22).

56. Ms. Logan further admits (i) none of the other employees who were allegedly harassed had complained to management, and (ii) she never saw Mr. Reed act improperly around upper plant management or Mr. Schild. (See L. Logan Depo. Vol. I, pp. 39-42 (attached here as Exhibit 23); See L. Logan Depo. Vol. I., pp. 46-47) (attached here as Exhibit 24).

57. Ms. Logan left work on August 22, 1996 on sick leave. (See F. Schild Aff. p. 5 and attached Aff. Exh. G).

58. General Motors first received notice of Ms. Logan's sexual harassment complaint around September 24, 1996, when Mr. Schild received a "Sickness and Accident Claim Form" in which Ms. Logan claimed she was suffering from "major depression caused by sexual abuse, verbal abuse by my boss." (See F. Schild Aff. p. 6 and attached Aff. Exh. G).

59. As it had done in the past, General Motors promptly investigated and remedied the situation. (See F. Schild Aff. p. 6 and attached Aff. Exh. H).

60. Specifically, Mr. Schild immediately launched a preliminary investigation, which

11

disclosed possible inappropriate conduct by Mr. Reed. An outside investigator was then called in, who interviewed over 38 people. During this period, both Ms. Logan and Mr. Reed were out on sick leave. (See F. Schild Aff. p. 6 and attached Aff. Exh. H).

61. The full investigation disclosed inappropriate conduct by both Mr. Reed and, to a lesser extent, Ms. Logan. (See F. Schild Aff. p. 6 and attached Aff. Exh. I).

62. Because termination of salaried employees (such as Ms. Logan and Mr. Reed) must be approved by the plant HRM Committee, that committee met on February 4, 1997 to consider appropriate discipline. (See F. Schild Aff. p. 6 and attached Aff. Exh. I).

63. Based on the findings of the investigation, the HRM Committee concluded both Mr. Reed and Ms. Logan had engaged in inappropriate behavior, and decided to terminate Mr. Reed. When Mr. Reed returned to work on February 17, 1997 he was informed of this decision. (See F. Schild Aff. p. 6 and attached Aff. Exh. I).

64. Finally, because the preliminary investigation disclosed possible inappropriate conduct, Mr. Schild decided to take further action by conducting a mandatory sexual harassment training class for all salaried personnel at the Shreveport plant on November 5 & 6, 1996. (See F. Schild Aff. p. 6 and attached Aff. Exh. J).

65. Ms. Logan left General Motors on sick leave on August 22, 1996; her job was then held open for her until she took a disability retirement effective January 1, 1998. See General Motors Response to Intervenor's Request for Production No. 16. (attached here as Exhibit 26).

66. Under her disability retirement, Ms. Logan receives 60% of her base pay (or $2433 a month) plus medical and life insurance until she turns age 65. See F. Schild Aff. at p. 10 and attached Aff. Exh. L.

67. When questioned why she would not return to work after Mr. Reed was terminated,

Ms. Logan offered nothing other than her subjective belief she feared she would be ostracized. See L. Logan depo. Vol. I., pp. 142-44. (attached here as Exhibit 27).

68.     Mr. Reed was not a "managerial agent" of General Motors because he had no policymaking power and only limited discretion to implement personnel policies: He was a second-line supervisor who was not a member of the Shreveport plant staff that made personnel policy and, to the extent he implemented policy, his discretion was limited by those polices. See F. Schild Aff. at p.11 and attached Aff. Exh. M.

69.     As Ms. Logan herself admits she was aware, Mr. Reed had no authority to unilaterally terminate Ms. Logan. See L. Logan Depo. Vol. I., pp. 69-70. (attached here as Exhibit 28).

                    Respectfully submitted,

                    _____
                    ROBERT K. McCALLA, T.A.
                      (LA Bar Roll No. 9233)
                    ROBERT RACHAL
                      (LA Bar Roll No. 22548)
                    McCalla, Thompson, Pyburn,
                      Hymowitz & Shapiro
                    650 Poydras Street, Suite 2800
                    New Orleans, Louisiana 70130
                    Telephone: (504) 524-2499

                    **COUNSEL FOR DEFENDANT,
                    GENERAL MOTORS CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing **DEFENDANT GENERAL MOTORS CORPORATION'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** has been served on:

Billy R. Pesnell
Hargrove, Pesnell & Wyatt
Post Office Box 10533
Shreveport, Louisiana 71161-0059

by placing a copy of same via Federal Express, this 27th day of September, 1999.

ROBERT K. McCALLA

V:\3074\5409\5409statement facts - sj